**[J-30-2021] [MO:Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.M., A MINOR | : | No. 1 MAP 2021 |
| | : | |
| | : | Appeal from the Order of Superior |
| APPEAL OF: B.M., MOTHER AND D.M. | : | Court at No. 3060 EDA 2019 dated |
| AND P.M., MATERNAL GRANDPARENTS | : | September 3, 2020, reconsideration |
| | : | denied October 14, 2020, Reversing |
| | : | the Decree dated September 27, |
| | : | 2019 by the Montgomery County |
| | : | Orphans' Court at No. 2019-A0053 |
| | : | and Remanding. |
| | : | |
| | : | ARGUED: April 14, 2021 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                           **DECIDED: July 21, 2021**

I concur in today's mandate, which affirms the Superior Court's decision to vacate the decree terminating J.C. ("Father")'s parental rights. However, I part ways with the learned Majority's analysis of *In re Adoption of M.R.D.*, 145 A.3d 1117 (Pa. 2016). I respectfully disagree with the Majority's disapproval of our Superior Court's reliance upon *M.R.D.* I believe that the intermediate appellate court faithfully and properly applied the principles that we expounded in that important and recent precedent.

I.

Father has had limited contact with C.M. ("Child") from the time of Child's birth in 2016. After making several unsuccessful attempts to arrange visitation with Child, Father filed a custody complaint on February 28, 2019. Father and B.M. ("Mother") participated in mediation and conciliation, but were unable to reach an agreement on custody. Consequently, the custody conciliator issued a report recommending that Father and

Child begin to attend reunification therapy.[1]  But no reunification occurred, as Mother and D.M. ("Maternal Grandfather") and P.M. ("Maternal Grandmother") opted swiftly to file a petition to terminate Father's parental rights ("TPR").  And they were not done; they followed up that April 15, 2019 TPR petition promptly by filing two additional pleadings: Mother's petition to voluntarily relinquish her own parental rights (April 26, 2019), and Maternal Grandparents' petition to adopt the Child as their own (April 30, 2019).

Sound familiar?  Yes, indeed.  We have seen this picture before, or something very much like it.  *M.R.D.* shows the template.  In that case, following a years-long absence from the children's lives, the father attempted to contact the mother regarding the children. 145 A.3d at 1118.  When the mother did not respond, the father filed a custody complaint. The following month, the mother filed a petition for termination of parental rights.  No doubt mindful that our Adoption Act requires that the TPR petition be filed in contemplation of an adoption, the mother proposed that the maternal grandfather would be the adoptive father.  *Id.* at 1119.[2]  Generally, a parent who consents to an adoption may retain parental rights to a child only if that parent's spouse adopts the child.  23 Pa.C.S. § 2903.  As the maternal grandfather was not the mother's spouse, the mother could not comply with the statutory requirements for an adoption, which, again, was a precondition to her ability to retain her own parental rights while seeking to terminate the father's.

---

[1]    Notes of Testimony ("N.T."), 6/10/2019, at 75, 79-81.

[2]    *See* 23 Pa.C.S. § 2512(b) (when a parent petitions for termination of parental rights of the other parent, the petition must contain "an averment that the petitioner will assume custody of the child until such time as the child is adopted").  We have held that a termination of parental rights petition filed by a parent is cognizable only if the parent demonstrates "that an adoption of the child is anticipated."  *M.R.D.*, 145 A.3d at 1120 (citing cases).

The mother attempted to show cause for her noncompliance with the statutory requirements,[3] and her arguments found traction in the lower courts. But this Court was not having it. We noted that parental consent to adoption and/or relinquishment of parental rights "permits the child and the adoptive parent or parents to establish a new parent-child relationship."[4] We emphasized that, "where no new parent-child relationship is contemplated, the involuntary termination of parental rights is not permitted under the Adoption Act."[5] We identified the purpose of the requirement of relinquishing or terminating parental rights as "facilitat[ing] a new parent-child relationship" and "protect[ing] the integrity and stability of the new family unit."[6]

We proceeded in *M.R.D.* to disapprove of the maternal grandfather's proposed adoption. Our reasons were several. First, the mother and the maternal grandfather were not part of an intact family unit, such as one established by stepparents or same-sex partners, who "form a new parent-child relationship with the legal parent's child" and who thereby create a new family unit with the child. *M.R.D.*, 145 A.3d at 1128. Second, without relinquishment of both parents' rights, there would be "a host of unique complications." *Id.* The maternal grandfather would become both father and grandfather; the maternal grandmother would become both grandmother and stepmother; the mother would become both mother and stepsister. If the mother later married, her spouse might be precluded from adopting if the maternal grandfather declined to relinquish his rights.

---

[3]    *See* 23 Pa.C.S. § 2901 ("Unless the court for cause shown determines otherwise, no decree of adoption shall be entered unless [a list of statutory requirements] have been met.").

[4]    *M.R.D.*, 145 A.3d at 1120 (quoting *In re B.E.*, 377 A.2d 153, 156 (Pa. 1977)).

[5]    *Id.* (quoting *In re Adoption of L.J.B.*, 18 A.3d 1098, 1108 (Pa. 2011) (plurality)) (cleaned up).

[6]    *M.R.D.*, 145 A.3d at 1128 (citing *B.E.* and *Adoption of J.D.S.*, 763 A.2d 867 (Pa. Super. 2000)).

Third, this Court recognized the potential for "misuse of adoption proceedings . . . as a means to involuntarily terminate the rights of unwanted parents, potentially allowing grandparents, cousins, . . . and a litany of other individuals who have a close relationship with a child to stand in as a prospective adoptive parents." *Id.* at 1129. This potential for gamesmanship was a driving factor in our decision to disallow the termination of the father's parental rights.

But our warning was not heeded, or not fully. The gamesmanship continues, as the adoption proposed here shows. To be sure, the Majority quite correctly identifies a distinction between *M.R.D.* and today's case.[7] In *M.R.D.*, the mother and the grandfather relied upon the cause shown exception because they could not meet the statutory requirements. Here, in the wake of *M.R.D.*, Mother and her parents deftly have added an additional touch: "Mother voluntarily relinquished her parental rights," and so Maternal Grandparents facially claim compliance with the statutory requirements without need to resort to the cause-shown exception.[8] Relying on this fine-grained distinction, the Majority concludes that *M.R.D.* does not apply and that the Superior Court erred in considering whether a new family unit was being formed and whether this case belonged in custody litigation rather than a TPR hearing.[9] The Majority puts more weight upon this artful distinction than it can bear.

*M.R.D.* was not the first case to cite the creation of a new family unit as the purpose of the Adoption Act, nor the first case to incorporate that principle into its rationale. In *B.E.*, the mother sought to terminate the parental rights of the father, whom the mother claimed had abandoned the child. *B.E.*, 377 A.2d at 154. The mother was unmarried at

---

[7]     *See* Maj. Op. at 23-26.

[8]     *Id.* at 26.

[9]     *Id.* at 25-27.

the time, and no adoption of the child was contemplated. The mother advanced two principal arguments. First, she contended that the then-applicable statute concerning who could file a TPR petition did not require that a parent attempting to terminate the other parent's rights file a report of intention to adopt. Second, the mother asserted that, because a single person was permitted to adopt, she should be able to terminate the father's rights and operate as a single parent. Notably, while the version of the Adoption Act then in force contained a provision similar to Section 2901,[10] neither the mother nor the Court invoked any cause-shown exception.

Rejecting both of the mother's arguments, the *B.E.* Court highlighted the purpose of the Adoption Act. Noting that the entire Act focuses upon adoptions, this Court held that "the purpose of voluntary relinquishment and involuntary termination of parental rights is evidenced by [the statutory section,] which provides that the effect of either decree shall be to extinguish the power or the right of such parent to object to or receive notice of [the] adoption proceeding." *Id.* at 155 (cleaned up). The purpose of terminating a parent's rights is evidenced by the fact that the provisions governing such actions form part of our Adoption Act. That circumstance makes "it clear that the Legislature intended the petition for involuntary termination of parental rights to be available solely as an aid to adoption." *Id.* Accordingly, this Court further held that termination "is required before the new parent-child relationship may be established." *Id.* at 156. Notably, in *B.E.*, the mother already enjoyed a parent-child relationship, so termination of the father's rights was not necessary in order to create that relationship. *Id.*

---

[10]    1 P.S. § 501 ("Unless the court for cause shown determines otherwise, no decree of adoption shall be entered unless the adoptee has resided with the petitioner for at least six months prior thereto or, in lieu of such residence, the adoptee is at least 18 years of age or is related by blood or marriage to the petitioner.") (repealed 1981).

This Court emphasized that the purpose of an involuntary TPR "is not to punish an ineffective or negligent parent." *Id.* Instead, the termination facilitates a non-consensual adoption "when, by choice or neglect, a parent has failed to meet the continuing needs of the child." *Id.* A TPR petition begins the process that "permits the child and the adoptive parent or parents to establish a new parent-child relationship through adoption." *Id.* In *B.E.*, because the mother was not proposing to establish any new relationship with the child, this Court refused to permit termination of the father's parental rights.

In *L.J.B.,* we confronted an unusual situation in which, during the pendency of an appeal of the termination of the mother's parental rights, the father and the stepmother separated, which called into question the validity of the proposed adoption that formed the basis of the TPR. *L.J.B.*, 18 A.3d at 1106. In a plurality decision, the Opinion Announcing the Judgment of the Court ("OAJC") remanded the case for a hearing as to whether the adoption was still contemplated, noting that a TPR petition filed by one parent against the other is only cognizable when a stepparent adoption is intended. The reason for this requirement, the OAJC explained, is that the TPR permits a new parent-child relationship between the child and the stepparent and protects "the integrity and stability of the new family unit." *Id.* at 1108 (quoting *J.D.S.*, 763 A.2d at 871). "[W]here 'no new parent-child relationship is contemplated,' the 'involuntary termination of . . . parental rights . . . is not permitted.'" *Id.* (quoting *B.E.*, 377 A.2d at 156). Because the Court could no longer be assured that an adoption — and therefore, a new parent-child relationship — was contemplated, the OAJC could not affirm or reverse the termination of the mother's parental rights without additional fact-finding.

In both *B.E.* and *L.J.B.*, without consideration of the cause-shown exception, this Court looked to the purpose of the Adoption Act as we considered the validity of the

proposed adoption, and, necessarily, the validity of the underlying TPR petition.[11] So while *M.R.D.* focused upon the cause-shown exception when explicating the purpose of the Act, our case law has not confined consideration of the Adoption Act's purpose to cause-shown cases. In limiting consideration of the purpose of the Act solely to such circumstances, the Majority construes *M.R.D.* too narrowly.

In the case that we confront today, it is salient that no new family unit and no new parent-child relationship would be formed by terminating Father's parental rights or by Maternal Grandparents' proposed adoption of Child. Maternal Grandfather admitted that he anticipated that Maternal Grandparents and Mother would play the same caregiving roles after the adoption as they did previously, save for any scenario in which Mother would become physically unable to care for Child.[12] There are no plans for any new living arrangements.[13] Mother testified that she cared for Child on a daily basis and that she would continue to do so.[14] Mother confirmed that there would be no change in her daily interaction with Child regardless of whether or not the TPR was granted.[15] From the testimony at the hearing, it was clear that nothing whatsoever in Child's life was going to change with this proposed adoption. Mother was still going to act as Child's mother.

---

[11]   *See also In re T.R.*, 465 A.2d 642, 644 n.10 (Pa. 1983) (directing that, upon remand, in addition to considering a TPR petition under the correct standard of proof, the trial court also "should consider, and not merely accept on its face, appellee's and his spouse's Declaration of Intent to Adopt, so that the issue of whether they genuinely seek the termination 'solely as an aid to adoption' to thereby establish a new 'parent-child relationship,' the 'singular concern' of the Adoption Act, may properly be determined.") (quoting *B.E.*, 377 A.2d at 155-56).

[12]   N.T., 7/17/2019, at 28-29, 31-32.

[13]   *Id.* at 31.

[14]   *Id.* at 73-74.

[15]   *Id.* at 87, 89.

Maternal Grandparents were still going to assist with child care. No new relationship would develop. There would be no new family unit. As in *B.E.*, the termination of parental rights would not foster any new relationship for Child. None of the purposes of the Adoption Act would be served by granting this TPR. The termination of Father's parental rights here is not permitted by the Act.

*M.R.D.* represented this Court's full-throated condemnation of the distortion, abuse and gaming of the statutory TPR process as a litigation scheme to circumvent and avoid child custody proceedings.[16] After our pronouncements there, I had thought it clear that TPRs should not be weaponized as implements in order to lever advantage in custody, to stiff-arm a neglectful father or mother, or to punish an inattentive parent who belatedly seeks to reconnect with a child. In *dictum*, the *M.R.D.* majority hypothesized that, had the mother in that case relinquished her parental rights, the grandfather might be permitted to adopt the children. *M.R.D.*, 145 A.3d at 1126. Mother and her parents appear to have taken this *dictum* as a hint or practice pointer, seizing upon it now as a roadmap to allow avoidance of *M.R.D.*'s holding. Unlike my esteemed colleagues in the Majority, I would not approve such artful but disingenuous litigation strategies, which seek creatively to switch the frame in order to beat back custody efforts.

In both *M.R.D.* and today's case, the non-custodial parent had been absent from the children's lives for an extended period of time. Then, that non-custodial parent attempted to reestablish contact, first through requests (and attempted requests) to the custodial parent, and then through the trial court after being rebuffed by the custodial parent. Confronted with the non-custodial parent's custody complaint, the custodial parent refused to proceed through the custody process that our law provides, resorting

---

[16] *See M.R.D.*, 145 A.3d at 1134 (Wecht, J., concurring) ("To countenance [such] litigation tactics would be to countenance corruption of our adoption laws.").

instead to the nuclear option: the draconian petition to terminate the non-custodial parent's rights. While I welcome (and join) the Majority's condemnation of the use of TPRs in custody proceedings,[17] I do not share in its disapproval of the Superior Court's invocation of *M.R.D.* to inhibit precisely such inappropriate gamesmanship in this case.

II.

Father detailed his attempts to contact Mother and Child. When Father moved back to Pennsylvania in July 2016, he tried to call Mother, but she did not answer his call.[18] Father also tried texting, but his "number was blocked from being accepted to her phone."[19] Father went to Mother's residence, but Mother told him that he was not welcome there.[20] "[A]fter some contact or discussion with Mother," Mother consented to Father's visitation with Child from August through October 2016.[21] Mother then terminated these visits, whereupon Father again tried to call and text Mother, albeit with no success.[22] Father also tried to arrange contact through a third party.[23] In December 2016, when Father was able to contact Mother on his work phone (which Mother had not

---

[17] *See* Maj. Op. at 29 n.10. Additionally, I agree with the Majority's observation that termination proceedings instigated by one parent against another are different from those initiated by an agency, and that the former merit particular attention from the trial court in order to ensure that the burden of clear and convincing evidence is satisfied. *See* Maj. Op. at 40-41.

[18] N.T., 6/10/2019, at 55-56.

[19] *Id.* at 56.

[20] *Id.* at 57.

[21] *Id.* at 58-59.

[22] *Id.* at 59.

[23] *Id.* at 59-60.

yet blocked), Mother stated that Child was not his daughter.[24]  Thereafter, Father's calls to Mother went unanswered.[25]

Father testified that, when his visitation was halted, he did not try to go to Mother's house because he "didn't want any charges pressed on [him]."[26]  Father stated that a police officer called him, warned him to stop attempting to contact Mother, and threatened to file harassment charges against him.[27]  Father's aunt made contact with Mother and received photos of Child.[28]  Father saw photos of Child through his aunt's efforts.[29] Father's older children have met Child and know her as a sister.

Father admitted that an eleven-month gap ensued before he again attempted to contact Mother.[30]  On November 22, 2017, Father called Mother seven times.  First, Mother did not answer; then, she hung up on Father; then, she repeated that Father was not Child's father; and, then, again, she hung up on Father.[31]  When Father requested

---

[24]     *Id.* at 61.

[25]     *Id.*

[26]     *Id.* at 60.

[27]     *Id.* at 34, 103, 117.  The trial court questioned the credibility of this statement because Father "provided no specifics and no corroboration of this allegation."  Trial Court Opinion ("T.C.O."), 9/26/2019, at 5.

[28]     N.T., 6/10/2019, at 39-42.

[29]     *Id.* at 71-72.

[30]     *Id.* at 62.

[31]     *Id.* at 64-65.  The trial court found that Father's testimony about Mother's denials of his paternity lacked credibility.  The trial court opined that Mother meant that Father was not acting like a father and that Father did not truly understand Mother to be questioning his paternity.  T.C.O., 9/26/2019, at 6.

visitation, Mother again told him that he was not the father and that he could not see Child.[32]  Father's wife corroborated Father's accounts of these calls.[33]

Father provided an explanation for some of the temporal gap during which he did not attempt to contact Mother.  First, Father was incarcerated between December 2017 and February 2018.[34]  After Father was released, he went to the Veterans Affairs ("VA") for treatment for PTSD and then resided in transitional housing through the VA until October 2018.[35]  Minors were not permitted in that transitional housing.[36]

In February 2019, Father again attempted to contact Child through Mother.  Father told Mother that he would file for custody if she would not agree to visitation.[37]  Mother responded that she would then file for child support.[38]  Father filed for custody because he "had no other option."[39]  When Mother filed for support, she requested paternity testing.  That testing confirmed that Father was Child's biological father.[40]

Mother denied that she blocked Father's calls or texts.[41]  She also denied that she told Father that he was not Child's father.[42]  Mother presented text messages that

---

[32]     N.T., 6/10/2019, at 66-67.

[33]     N.T., 7/17/2019, at 151-53.

[34]     *Id.* at 112.

[35]     *Id.* at 113.

[36]     *Id.* at 113-14.

[37]     N.T., 6/10/2019, at 71.

[38]     *Id.* at 72.

[39]     N.T., 7/17/2019, at 122.

[40]     N.T., 6/10/2019, at 83, 86.

[41]     N.T., 7/17/2019, at 41-42.

[42]     *Id.* at 45.

included her saying, "You are not a father and you never will be. You're a sperm donor."[43] While Mother did not list Father on Child's birth certificate,[44] she claimed that she asked for a paternity test only to prevent Father from denying paternity.[45]

Mother and Maternal Grandfather testified that they sought the adoption in order to prepare in the event that Mother's medical conditions worsened.[46] Maternal Grandfather asserted that he sought to adopt Child because he "would have no faith in [Father] after the first three years of [Child's] life."[47] Mother stated that she agreed to the adoption because she "would have no trust in [Father] raising my child."[48] She also admitted that the TPR was not filed prior to 2019, despite Father's lack of involvement in Child's life in prior years, "because we were not going to court back [then]." [49]

The record before us in this case paints a not uncommon picture of a parent who was uninvolved in his or her child's life due to personal difficulties, obstacles erected by the other parent, and a failure to follow through with unswerving consistency. Once Father made serious, albeit belated, progress toward reuniting with Child, Mother decided simply to terminate his parental rights. Why not? It is undeniable (and Mother did not

---

[43]    *Id.* at 50.

[44]    *Id.* at 71-72.

[45]    *Id.* at 52.

[46]    *Id.* at 13-14, 38. The trial court found credible Mother's and Maternal Grandfather's testimony regarding their rationale for the adoption as related to Mother's medical conditions. T.C.O., 9/26/2019, at 11. No expert testimony concerning these conditions was presented.

[47]    N.T., 7/17/2019, at 14.

[48]    *Id.* at 68.

[49]    *Id.* at 84. *See also* N.T., 7/17/2019, at 85 ("Q: So when [Father] uses the court in 2019 to say I want to see my daughter, that's when you decided to file the [TPR] petition, is that correct? A: Correct.").

attempt to deny) that this TPR was motivated by Father's custody petition. That motivation should not be ignored or discounted, and our Superior Court should not be faulted for considering that motivation in its decision. This was, and this is, a case about child custody. It should never have been in Orphans' Court. It should never have been a TPR petition, much less a TPR decree.

III.

In 2019, the year in which this TPR was filed, 1,182 contested TPRs were adjudicated in Pennsylvania.[50] In Montgomery County alone, in 2019, where and when this petition was filed, 347 relinquishment and/or termination petitions were filed, and 279 were decided. Our Orphans' Courts are busy enough with termination cases. Many of these cases are wrenching and difficult. We should not lightly add to this burden cases that are properly custody disputes at root. Our custody courts have broad and robust discretion. They are well-equipped to craft custody arrangements that protect the children's best interests and consider fully the consequences of parental inattentiveness and dereliction.[51]

The termination of parental rights is a draconian measure, sometimes labeled "the equivalent of a death sentence" for the parent-child relationship.[52] The TPR process does not aim to punish, or to exact retribution or vengeance, or to slap down a suboptimal

---

[50] All statistics appear in the 2019 Caseload Statistics of the Unified Judicial System of Pennsylvania, available at https://www.pacourts.us/Storage/media/pdfs/20210205/174304-caseloadstatisticsreport2019.pdf.

[51] *See M.R.D.*, 145 A.3d at 1135 (Wecht, J. concurring) ("[T]rial courts all across this Commonwealth[ have] robust discretionary authority to limit and even completely curtail [a parent's] custody rights under the custody statutes without resort to the draconian remedy of termination of parental rights under the adoption laws.").

[52] *In Int. of Lilley*, 719 A.2d 327, 329 (Pa. Super. 1998). *See In re Bowman*, 666 A.2d 274, 280 (Pa. 1995) (Opinion in Support of Reversal) (calling termination of parental rights "one of the most serious and severe steps a court can take").

parent.[53] "It is emphatically not a tool to be deployed in custody disputes."[54] Rather, the extreme remedy of termination is designed to allow and to foster the adoption of a child when (but only when) proper grounds exist and when the creation of a new family unit and a new parent-child relationship is in the child's best interests. By this late date, it should be crystal clear that Pennsylvania's courts should not countenance TPRs sought simply to gain and lock down full custody of a child to the permanent exclusion of another parent. As the OAJC noted in *L.J.B.*, "the creation of parental termination absent stepparent adoption would provide parents with a new, and in our view dangerous, tactic in heated custody disputes; indeed, one can imagine routine cross-petitions for termination as part of custody battles."[55] The *M.R.D.* Court similarly warned that granting the TPR in that case could "open the door for misuse of adoption proceedings by spiteful parents as a means to involuntarily terminate the rights of unwanted parents, potentially allowing grandparents, cousins, pastors, coaches, and a litany of other individuals who have a close relationship with a child to stand in as prospective adoptive parents so that termination may be achieved."[56] It seems that the dystopian future against which we

---

[53] *See generally B.E.*, 377 A.2d at 156.

[54] *M.R.D.*, 145 A.3d at 1133-34 (Wecht, J. concurring).

[55] *L.J.B.*, 18 A.3d at 1110.

[56] *M.R.D.*, 145 A.3d at 1129. Concurring in *M.R.D.*, Chief Justice Baer also noted that, in this type of situation, the TPR more often benefits the parent rather than the child:

> Terminating an uninvolved parent's rights does not remedy any harm caused by that parent's absence in the child's life. The only benefit of terminating a non-involved parent's rights without substituting a new parent is arguably to the involved parent: it removes the involved parent's fear that the non-involved parent will have a change of heart and want a relationship with the child (which may, in the long term, benefit the child); it removes the risk to the involved parent of having to litigate child custody; it dispels the involved parent's feeling that his or her efforts are underappreciated in the eyes of the law, etc.

warned has now arrived. Today, alas, that grim prospect receives a surprisingly sympathetic hearing and welcome in this Court.[57]

The "dangerous . . . tactic" foreseen by *L.J.B.* is precisely what Mother and her parents pursued in today's case. As in *M.R.D.*, no one considered seeking termination of Father's parental rights here until he filed a complaint in custody. Instead of pursuing relief in custody court, Mother turned directly to the nuclear button, seeking the most dramatic remedy possible: termination of Father's parental rights. Instead of trusting the custody court to credit her arguments, evidence, and legal position in order to limit or even bar entirely Father's involvement with Child, Mother decided that Father should not get the chance even to seek to demonstrate over time that his involvement (however slight) with Child might be in Child's best interest. The Superior Court did not err in considering these factors. Indeed, and especially given this Court's directions in *L.J.B.* and *M.R.D.*, the Superior Court did precisely what it should have done.

IV.

The Majority will no doubt fault me, as it did the Superior Court, for displacing the trial court's fact-finding and credibility determinations.[58] But the Majority itself dives quite deeply into the record when it proceeds to conduct its own sufficiency of the evidence review. Like the Majority, I have turned to the record to examine and determine whether competent evidence supported the trial court's conclusions, as our standard of review

---

145 A.3d at 1132.

[57]    In *M.R.D.*, I noted that the Superior Court "strikingly ignore[d] the fact that the proposed adoption lacked the required integrity, inasmuch as it appears to have been initiated merely to stave off and defeat Father's claim for custody." *M.R.D.*, 145 A.3d at 1134 (Wecht, J. concurring). The trial court made the same mistake here.

[58]    Maj. Op. at 27-28.

requires.[59] The Majority takes the Superior Court to task for disregarding the trial court's specific credibility determinations. Yet, at the same time, as it reviews the sufficiency of the evidence, the Majority itself appears at times to liberate itself as needed from the facts, testimony and credibility findings upon which the trial court chose to rely when that court was called upon to defend its ruling. It seems to me a surpassingly fine distinction indeed to deem a reviewing court bound when a trial court decides that it finds specific testimony credible or not, but not bound when a trial court relies upon testimony or a fact without specifically stating that the testimony is credible or that the fact is found. For present purposes, one example will suffice. While noting the trial court's error in failing to emphasize the events of the six months prior to the filing of the TPR petition, the Majority nonetheless places great weight on Father's attempt to contact Mother in February 2019 and his filing for custody and participating in the custody process.[60] While I quite agree that these latter facts have great weight, we must recognize that the trial court paid them scant attention.[61] My point here is that the Majority's decisions on what to accept and what to reject in the trial court's determinations appear somewhat selective.

Ultimately, I do not agree with the Majority's view that the Superior Court disregarded the trial court's credibility determinations and fact-finding. Instead, it appears that the intermediate panel used the credited testimony to reach the legal conclusion (a distinctly appellate prerogative of course) that "Maternal Grandparents' adoption lack[ed]

---

[59] *In re Adoption of S.P.*, 47 A.3d 817, 821 (Pa. 2012).

[60] Maj. Op. at 39-40.

[61] T.C.O., 9/26/2019, at 11 ("Whether or not [Father] has been diligent in his efforts beginning in February of 2019, he has already failed to exercise such diligence . . . .").

integrity" and could not support a TPR petition.[62] This is not to say that I think the Majority errs in the conclusions it reaches upon reviewing the record when it turns, ultimately, to Father's sufficiency challenge. Rather, it is to say that I agree with the Superior Court that the sufficiency challenge need not be reached in this case. Perhaps at some level there is little ultimate distinction between the two exercises, but I perceive some tension between the Majority's criticism of the Superior Court's scrutiny of the record and the Majority's own fine-grained analysis of that record.

V.

Inasmuch as the Majority dives into the record, I too have taken the plunge. So immersed, I wish to note more than a few troubling aspects in the testimony adduced at the TPR hearing. First, the lack of expert testimony regarding Mother's condition and diagnoses of lupus and scleroderma is glaring. No, it is beyond glaring. This is especially so given the emphasis that the trial court placed upon lay testimony purporting to opine on these medical matters. The trial court rejected Father's argument that the TPR petition was filed because he had sought custody rights. Instead, the trial court discounted the timing of the various filings, and chose to credit Mother's and Maternal Grandfather's claims about Mother's medical conditions, which assertedly justified their desires for stability for Child and in turn guided their motivations for the TPR. Based upon Mother's

---

[62]     *In re Adoption of C.M.*, 2020 WL 5269235 at *6 (Pa. Super. Sept. 3, 2020). The Superior Court acknowledged the trial court's credibility determinations as follows:

> At the outset, we highlight that the orphans' court made a credibility determination in favor of Mother and the maternal grandfather, which we do not disturb. The motivation for the adoption is obvious from the credible testimony that they sought to terminate Father's parental rights in order to ensure that [Child] remains with Maternal Grandparents in the event that Mother's health deteriorates.

*C.M.*, 2020 WL 5269235 at *5 (citation omitted).

lay medical diagnoses, the trial court found that the termination of parental rights and the adoption were in Child's best interests.[63] Maternal Grandfather testified that Mother, at the time of the hearing, was attending nursing school and working at a daycare facility.[64] Maternal Grandfather testified that, despite Mother's diagnoses, she kept up with schoolwork, employment, and child care.[65] Maternal Grandfather stated that he understood Mother's condition "can be debilitating, fatal in the end results of the disease."[66] Yet, Mother has not had any problems caring for Child.[67] Mother testified to her understanding that, while lupus is not fatal, scleroderma usually is fatal within ten years.[68] Mother admitted that she had not done much research into the diseases.[69] The Majority states that this testimony establishes Mother's and Maternal Grandfather's lay understanding of Mother's medical conditions.[70] Absent relevant objections, I suppose it does, so far as that goes. But without expert testimony, the trial court could not be confident that this testimony accurately characterized Mother's prognosis. As the Majority frankly concedes, "we are left to speculate about whether [] Mother's understanding of her dire ultimate prognosis is in fact correct, and if not, whether the proposed adoption plan remains reasonably calculated to [Child's] needs and welfare. . . ."[71] To say the

---

[63]   T.C.O., 10/31/2019, at 3.

[64]   N.T., 7/17/2019, at 9.

[65]   *Id.* at 11.

[66]   *Id.* at 13.

[67]   *Id.* at 27.

[68]   *Id.* at 37.

[69]   *Id.* at 36-37.

[70]   Maj. Op. at 42.

[71]   *Id.*

least, trial courts should be deeply wary of placing such overwhelming weight on purportedly medical testimony offered by laypersons, particularly when termination of parental rights relies in part on such testimony.

Second, there was no testimony whatsoever from Maternal Grandmother, who lives with Child and would become Child's parent if this proposed adoption were granted. The trial court indicated that it expected to hear from Maternal Grandmother at a separate adoption hearing.[72]  It is troubling that Maternal Grandmother had no involvement in the TPR proceeding whatsoever, notwithstanding the fact that the trial court anticipated her assumption of parental duties.[73]  The trial court was left to accept (and, apparently, it did accept) second-hand testimony concerning Maternal Grandmother's putative intentions. It would certainly be far too late for Father (and Child) if, well after Father's rights were terminated, the trial court, upon hearing from Maternal Grandmother for the first time, discovered something amiss that cast doubt upon its termination decree or the planned adoption.

VI.

Finally, my review of this record compels me to offer a word about standing, as it suggests yet an additional deficiency in the troubled history of this case.  Father challenged Maternal Grandparents' standing for the first time in his concise statement of errors complained of on appeal filed pursuant to Pa.R.A.P. 1925(b).  The trial court

---

[72]     T.C.O., 10/31/2019, at 4.

[73]     *See, e.g., In re E.M.I.*, 57 A.3d 1278, 1289-90 (Pa. Super. 2012) (denying the mother's petition to terminate the father's parental rights to facilitate the child's adoption by the mother's domestic partner and noting that "the absence of [the domestic partner's] testimony limited the court's ability to evaluate her relationship with [the child] or the genuineness of [the partner's] intention to adopt [the child]" and "[t]he court properly refused to guess [the partner's] intentions or accept evidence of her intentions second-hand").

correctly found that this issue was waived as untimely raised.[74]  In Pennsylvania, a challenge to standing is waivable.[75]  Thus, the trial court was not obliged to raise the issue of standing *sua sponte* in the absence of any timely challenge from a party.

In their TPR petition, Maternal Grandparents noted that they lived with Child for more than two years.  Presumably, this formed the basis for their putative standing to file the TPR petition, although they cite no statutory provision.[76]  Perhaps Maternal Grandparents intended to rely upon 23 Pa.C.S. § 2512(a)(3), which provides that any "individual having custody or standing *in loco parentis* to the child" may file a TPR petition. If so, they failed to say so.  The trial court opined afterward simply that Maternal Grandparents "stand *in loco parentis* to [Child] and have standing to file a [TPR] petition."[77]

There may have been a colorable argument as to whether Maternal Grandparents stood *in loco parentis* (or not).  "[T]he legal status of *in loco parentis* refers to a person who puts himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption."[78]  This Court also has recognized that cohabitation with the subject child does not necessarily confer *in loco parentis* standing.[79]  Courts have held that *in loco parentis* status is not conferred when a grandparent's assumption of parental responsibilities is

---

[74]     T.C.O., 10/31/2019, at 2.

[75]     *In re Condemnation by Urb. Redev. Auth. of Pittsburgh*, 913 A.2d 178, 181 n.6 (Pa. 2006).

[76]     Petition for Involuntary Termination of Parental Rights, 4/15/2019, at 1.

[77]     T.C.O., 10/31/2019, at 3.

[78]     *In re B.L.J., Jr.*, 938 A.2d 1068, 1073 (Pa. Super. 2007) (cleaned up).

[79]     *See C.G. v. J.H.*, 193 A.3d 891 (Pa. 2018).

"more consistent with [the grandparent] assisting [the parent and the child] in a time of need than with [the grandparent's] informal adoption."[80]

Here, Maternal Grandfather testified that he and his wife took care of Child while Mother attended school in the evenings.[81] He characterized the relationship as "more than grandparents."[82] He detailed that he and his wife spend time with Child daily and that they share a close bond.[83] However, there also was testimony that Mother provided daily care for Child. Whether or not Maternal Grandparents were acting *in loco parentis* or were, instead, frequent caretakers assisting Mother with Child's care was never explored because Father did not raise the issue of standing when he had the opportunity to do so.

If the issue had been raised timely, and if the trial court still had determined that Maternal Grandparents had standing, any error in that finding would likely have been harmless. Mother joined the TPR petition, and she had standing as a parent to file against Father. 23 Pa.C.S. § 2512(a)(1). Here, Father did not challenge standing until he brought his appeal. Thus, the trial court was correct to find waiver. I address the issue only to remind practitioners that standing is a contestable issue, and that the failure to raise it in a timely fashion results in waiver.

\* \* \* \*

---

[80] *D.G. v. D.B.*, 91 A.3d 706, 711 (Pa. Super. 2014). *See Argenio v. Fenton*, 703 A.2d 1042, 1044 (Pa. Super. 1997) (concluding that the grandmother did not have *in loco parentis* status because the grandmother acted as no more than a caretaker, in effect, a babysitter for the child, albeit a frequent caretaker, and that the daughter's actions in leaving her child with the grandmother "were appropriate and were consistent with that which would be expected of a young, unwed mother who was trying to obtain an education, be productive, and continue to develop socially").

[81] N.T., 7/17/2019, at 14.

[82] *Id.* at 21.

[83] *Id.* at 21-22.

I concur in the Majority's judgment that Father's parental rights should not have been terminated. However, relying upon *M.R.D.*, I would have reached that conclusion because the TPR petition here served as a pretext to remove this case from the custody court, which is the forum in which it belonged. As in *M.R.D.*, the TPR petitioners here engaged in impermissible gamesmanship. The Superior Court was right to flash a red light. The proposed adoption would not further the goals of the Adoption Act. No new parent-child relationship or new family unit would be created. For these reasons, like the Superior Court, I would not reach Father's sufficiency challenge. The TPR petition here failed at the very threshold. I do note, however, that, were I compelled to reach that sufficiency challenge, my own review of this record would incline me to agree with the Majority that the evidence here was not sufficient to support termination of Father's parental rights.